# In the United States Court of Federal Claims

No. 19-376C

(Filed: September 20, 2019)

| | |
|---|---|
| **THOMAS NUSSBAUM,** | Contract dispute subject to the Contract Disputes Act, 41 U.S.C. §§ 7101-7109; timeliness; equitable tolling |
| Plaintiff, | |
| v. | |
| **UNITED STATES,** | |
| Defendant. | |

Thomas Nussbaum, *pro se*, Millbrae, California.

Sonia Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

Plaintiff Thomas Nussbaum has brought suit against the United States acting through the Federal Bureau of Prisons ("Bureau" or "Bureau of Prisons"), alleging that the Bureau failed to pay him in full for work done to replace boilers at the Federal Correction Institution, Victorville, California ("Victorville"). Compl. at 5. Mr. Nussbaum seeks $201,735 in damages and lost profits, plus interest and attorneys' fees and costs. Compl. at 19-20.

Mr. Nussbaum filed his complaint in March 2019. He alleges four counts against the Bureau of Prisons: (1) fraudulent and intentional misrepresentation when Victorville induced him to believe his bid was accepted or that he would be a sub-contractor on a bonded construction contract but was instead made a sub-supplier without a bond on an impermissible purchase order, Compl. at 15-16; (2) negligent misrepresentation on the same premise, Compl. at 16; (3) a breach of the implied covenant of good faith and fair dealing for the misrepresentations and for engaging in improper procurement practices, Compl. at 16; and (4) unjust enrichment for not paying for labor and parts supplied by Mr. Nussbaum, Compl. at 17. Mr. Nussbaum's damages consist of $45,000 for being induced improperly by the Bureau and prime contractor, Cal Inc., to lower his bid, $62,113 for uncompensated work requested and performed by the Bureau that was outside the original contract, $80,375 for costs incurred due to actions of the prime contractor that necessitated Mr. Nussbaum to perform extra work and bring lawsuits against several subcontractors and the prime contractor, and $14,247 for lost profit at a rate of

15% on the $63,133 in change orders and $37,806 in extra work necessitated by actions of the prime contractor. Compl. at 17-19. Mr. Nussbaum provided 19 exhibits, which consisted of, among other things, the solicitation, the contract, various letters sent by Mr. Nussbaum to the contractor, Cal Inc., and the Bureau of Prisons disputing work performance or payments, invoices for Mr. Nussbaum's expenses for the project, and an investigation by the Bureau of Prisons into Mr. Nussbaum's allegations of improper procurement practices by the Bureau relating to his work. Compl. Exs. 1-19.[1]

Pending before the court is the government's motion to dismiss Mr. Nussbaum's complaint for lack of subject-matter jurisdiction. Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 12. The government contends that Mr. Nussbaum's complaint is barred by the six-year statute of limitations prescribed under 28 U.S.C. § 2501 and that Mr. Nussbaum, as a sub-supplier, lacks standing to sue the government. *See generally* Def.'s Mot. Mr. Nussbaum has responded in opposition, *see* Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n."), ECF No. 15, and defendant has filed a reply, *see* Def.'s Reply to Pl.'s Response ("Def.'s Reply"), ECF No. 17. A hearing was held on August 29, 2019. *See* Hr'g Tr. 3:4 to 29:3 (Aug. 29, 2019).[2]

The court concludes that Mr. Nussbaum's complaint falls outside the statute of limitations imposed on claims arising under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-7109. But because the statute of limitations under that Act does not go to jurisdiction and may be equitably tolled, the court addresses the standard for equitable tolling. In that respect, the court finds that Mr. Nussbaum has not satisfied the exacting standard for equitable tolling, and thus the court dismisses his suit for failure to state a claim upon which relief can be granted under the CDA.

## BACKGROUND[3]

### *A. Contract Solicitation Process*

Mr. Nussbaum supplied Victorville with two central plant boilers in 2000. Compl. at 9. At that time, Mr. Nussbaum had quoted $200,000 to change the burners to comply with certain nitrogen oxide emission requirements, but Victorville opted instead to implement a Selective Catalytic Reduction ("SCR") system, which Mr. Nussbaum alleges cost over $1 million. Compl. at 9. Despite its cost, the SCR system failed to meet the emission standards, requiring Victorville to implement upgrades that would. Compl. at 9.

Accordingly, during the fall of 2001, Victorville solicited bids for a construction project to upgrade the two existing boilers and install a new, third boiler. Compl. Ex. 1 at 2. Mr. Nussbaum and two other companies submitted bids. *See* Compl. Ex. 1 at 2. The lowest of the three, Mr. Nussbaum offered to complete the project for $320,000. Compl. Ex. 12 at 2. The

---

[1]Some of Mr. Nussbaum's exhibits are individually numbered, but because others are not individually paginated, citations to page numbers refer to the page markings as assigned by the court's Electronic Filing System.

[2]The date will be omitted from further citations to the hearing transcript.

[3]This background does not constitute findings of fact by the court. Rather, its sole purpose is to provide context for an analysis of the government's motion to dismiss.

other bidders were Southern California Boiler, Inc. and Automatic Boiler Company, which had bid $331,130 and $343,386, respectively. Compl. Ex. 14 at 2-7.

Mike Fief, Victorville's General Foreman, informed Mr. Nussbaum on November 21, 2001 that he "would really like to see the bid go to Cal Inc." because he had an ongoing working relationship with them. Compl. Ex. 11 at 2. Cal Inc. had not bid on the project but it did have a preexisting Schedule Contract with General Services Administration ("GSA") to provide environmental services. Compl. at 6. Consequently, Mr. Nussbaum's quote was forwarded to Cal Inc., which, upon receipt of the bid, made some modifications to his proposals and requested that he re-quote his price based on those changes. *See* Compl. at 17. Mr. Nussbaum did not think the alterations would meet the required emission standards, but he lowered his price from $320,000 to $275,000 on the understanding that Cal Inc. had Victorville's authority to make the changes. *See* Compl. at 17.

Victorville then arranged for Cal Inc. to "broker" the project under its Schedule Contract while Mr. Nussbaum supplied materials and performed the actual construction work. Compl. at 6. To that end, Victorville's Contracting Officer, Contigny Arakaki, issued a purchase order to Cal Inc. for a total price of $398,141. Compl. at 6. The use of a purchase order for this project was "improper," Mr. Nussbaum alleges, because purchase orders are disallowed for construction work. Compl. at 6, 8. Moreover, the amount of the purchase order issued to Cal Inc. exceeded Mr. Nussbaum's original bid amount by $78,141, a difference he regards as Cal Inc.'s "commission" for Victorville's use of a Schedule Contract rather than directly issuing him a construction contract. Compl. at 6. He maintains that Victorville designed this arrangement to circumvent GSA requirements for construction projects and to conceal the fact that Victorville had imprudently spent a significant amount of money on the unsuccessful SCR system when it could have implemented the necessary changes up front for only $200,000 based on the quote Mr. Nussbaum provided when he did the initial work. *See* Compl. at 5-6, 14.

### B. *Contract Performance and Disputes*

Work on the boiler project was well underway by May 2002, but disagreements soon emerged. Victorville requested a series of what Mr. Nussbaum characterizes as "change orders," which involved work such as changing pipes, adding a flue stack, and pouring a new cement pad. Compl. at 17. Mr. Nussbaum considered these to be change orders because he had not included them in his bid, but Victorville countered that the matters had been discussed in the original project walk-throughs and that Mr. Nussbaum was merely "trying to compensate for his losses" after underbidding the job. Compl. Ex. 15 at 48. Nonetheless, reluctant to stop work and assuming the disagreements would be resolved, Mr. Nussbaum and his subcontractors continued to perform. *See* Compl. Ex. 15 at 51. Victorville never paid for the disputed amounts.

Then, Mr. Nussbaum asserts that in October 2002, Cal Inc. "interceded" with Mr. Nussbaum's subcontractors, Desert Boiler and Bay City, directly paying them more than they were entitled to receive before the work was finished and doing so out of funds he asserts Cal Inc. owed to him. *See* Compl. at 18. Further complicating matters, after receiving payment from Cal Inc., Desert Boiler left the job unfinished, leaving Mr. Nussbaum to finish the work and later requiring him to incur $23,000 of legal fees to obtain only a partial recovery from Desert Boiler. *See* Compl. at 18.

### *C. Post-Completion Developments*

Mr. Nussbaum had completed the project by April 9, 2003, when Victorville issued final acceptance. Compl. at 7. He then pursued two separate but simultaneous courses of action: he filed a complaint with the Office of the Inspector General and he brought a legal action in state court against Cal Inc. for the remaining amount due that it refused to pay him. *See* Compl. at 7; *see also* Compl. Ex. 7 at 4.

Mr. Nussbaum's complaint with the Office of the Inspector General was filed in September 2004, and alleged that Victorville did not award the contract to the lowest bidder, that Cal Inc. was not qualified to do the work, that the use of a purchase order was inappropriate, and that the Contracting Officer, Contigny Arakaki, told him she did not sign the purchase order and that someone must have forged her signature. *See* Compl. Ex. 7 at 4. The Inspector General investigated the matter and, in a redacted report issued by Special Agent Kenneth Strange in October 2004, concluded that "the funding mechanism for the contract was appropriate." Compl. Ex. 7 at 4. Ms. Arakaki reportedly told Strange that she had signed the purchase order, that she did not accept any bribes relating to the contract, and that she found nothing "suspicious about the manner in which the purchase order was completed." Compl. Ex. 7 at 6-7.

Mr. Nussbaum's legal action against Cal Inc. was brought at some time before October 2004, and a settlement eventually was reached by February 2010. *See* Compl. at 12.[4] The settlement included a recovery of $80,000 from Cal Inc. but that amount did not include any compensation for the disputed change orders, which Victorville had never paid to anyone. *See* Compl. at 18. Therefore, Cal Inc. also agreed to issue a Form SF30 to Victorville requesting payment of expenses associated with the change orders, which it did effective January 5, 2010. *See* Compl. at 18; *see also* Compl. Ex. 6. Mr. Nussbaum sent the SF30 to Victorville and the Bureau offices in Grand Prairie, Texas and Dublin, California. Compl. at 7. He received no response from Ms. Arakaki. Compl. at 12. The only acknowledgement he received was from John Wenkman in Grand Prairie on March 10, 2010. Compl. at 7; *see also* Compl. Ex. 3. Mr. Wenkman denied the claim on grounds that Mr. Nussbaum was an improper party to make the submission, noting that "the formal request for payment of these services should be requested by Cal Inc." because the contract was with Cal Inc. Compl. Ex. 3 at 2.

What happened after Nussbaum received the denial from Mr. Wenkman is not entirely evident. Mr. Nussbaum provided the court no information concerning actions he took with respect to his claim during the nine-year period from when he received the denial in March 2010 to the time he filed suit in this court in March 2019. In a hearing conducted by the court on August 29, 2019, Mr. Nussbaum suggested that he had taken actions with the Government Accountability Office ("GAO") related to his claims during this period, and the court requested that he produce information regarding those efforts. Hr'g Tr. 17:21 to 19:5, 25:4 to 26:15. Mr. Nussbaum subsequently submitted a chain of emails with the GAO that were sent in August 2019, after he had filed this suit. *See* Scheduling Order, ECF No. 18; *see also* Pl.'s Resp. to Order, ECF No. 21. Those emails show that Mr. Nussbaum contacted Lacy Vong at the GAO on

---

[4]None of the parties' filings specify exactly when this litigation occurred, but the Inspector General investigation report, dated October 2004, indicates that the Cal Inc. litigation had commenced by that time. Compl. Ex. 7 at 5. Likewise, the SF30 that emerged from the settlement with Cal Inc. was signed in early January 2010, indicating that litigation had concluded around that time. Compl. Ex. 6 at 2.

4

August 23, 2019 and again on August 27, 2019, alleging that Ms. Arakaki engaged in "unlawful" conduct and that the Inspector General investigator perpetrated a "cover up" of her behavior. Pl.'s Resp. to Order at 4, 6. Because Ms. Arakaki had "abandoned her duties as [Contracting Officer], Mr. Nussbaum requested that the GAO step in and review her actions. *Id.* at 6. Ms. Vong replied on August 27, acknowledging the emails and informing him that she had forwarded the information on to GAO's fraud division for further investigation. *Id.* at 4. Thus, none of the information Mr. Nussbaum produced in response to the court's order had any relation to his pursuit of his claims between March 2010 and March 2019. In short, there is no evidence in the record indicating Mr. Nussbaum's actions to further his claims during this nine-year period.

## STANDARDS FOR DECISION

### A. *Rule 12(b)(1) – Lack of Subject-Matter Jurisdiction*

The Tucker Act provides this court with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act does not, however, provide substantive rights. *See United States v. Testan*, 424 U.S. 392, 398 (1976). To establish this court's jurisdiction under the Tucker Act, Mr. Nussbaum "must identify a substantive right for money damages against the United States separate from the Tucker Act." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004). An express or implied contract creates such a right, 28 U.S.C. § 1491(a)(1), and the CDA confers jurisdiction on this court to hear disputes involving government contracts, 41 U.S.C § 7104(b).

A claim in this court is "barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. The six-year statute of limitations specified in Section 2501 is jurisdictional and is thus not susceptible to equitable tolling or any of the other doctrines that would excuse an untimely claim. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133-36 (2008). "Courts created by statute can have no jurisdiction but such as the statute confers." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988) (quoting *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850)).

Claims that fall under the CDA, however, must proceed through a mandatory administrative process. 41 U.S.C. § 7103(a); *see also Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 265 (2006), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007). A contractor must first submit a written claim within six years of accrual to the contracting officer, who has 60 days in which to respond or, if no response is received, the claim is deemed denied by operation of law. 41 U.S.C. § 7103(f)(5). Upon a decision or a denial by operation of law, the contractor has one year in which to bring an action in this court. 41 U.S.C. § 7104(b). It is an open question whether, unlike 28 U.S.C. § 2501, the one-year statute of limitations provided by the CDA is non-jurisdictional and subject to equitable tolling. *See Guardian Angels Med. Serv. Dogs, Inc. v. United States*, 809 F.3d 1244, 1252-53 (Fed. Cir. 2016) (declining to decide whether the one-year filing period is jurisdictional). Assuming it is non-jurisdictional, equitable tolling requires the litigant to establish two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, ___U.S.___, ___, 136 S. Ct. 750, 755 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

5

Mr. Nussbaum, as plaintiff, must establish jurisdiction by a preponderance of the evidence. *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).[5] When ruling on the government's motion to dismiss for lack of jurisdiction, the court must "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). Yet, "[i]f a court lacks jurisdiction to decide the merits of a case, dismissal is required as a matter of law." *Gray v. United States*, 69 Fed. Cl. 95, 98 (2005) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985)); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### B. Rule 12(b)(6) – Failure to State a Claim

A complaint will survive a motion to dismiss under RCFC 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted).

When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986)) (additional citation omitted). Conclusory statements of law and fact, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557); accord *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

## ANALYSIS

Mr. Nussbaum asserts that the statute of limitations should be equitably tolled because the contracting officer, Contigny Arakaki, "abandoned her duties" by refusing to hear or reply to his claims, requiring him "to find someone else to perform them." Pl.'s Opp'n. at 10. He contends that the GAO's Oversight Department is responsible for appointing someone to perform the contracting officer's duties and he is awaiting "commitment from GAO on that issue." *Id.* He alleges that Ms. Arakaki engaged in "prosecutable acts" designed to deny him

---

[5] A court may "grant the *pro se* litigant leeway on procedural matters, such as pleading requirements." *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1356 (Fed. Cir. 2007) (citing *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("An unrepresented litigant should not be punished for his failure to recognize subtle factual or legal deficiencies in his claims.")). But this leniency cannot extend to lessening jurisdictional requirements. *See Kelley v. Secretary, United States Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987) ("[A] court may not . . . take a liberal view of . . . jurisdictional requirement[s] and set a different rule for *pro se* litigants only.").

"due process" and that these actions made it "impossible to comply" with the statute of limitations. *Id.*

The government relies on Section 2501, arguing that this court lacks jurisdiction to consider Mr. Nussbaum's complaint because it is untimely and, because Section 2501 is jurisdictional, the six-year statute of limitations is not susceptible to equitable tolling. Def.'s Reply at 3. Alternatively, the government asserts that to the extent Mr. Nussbaum's claims are considered pass-through claims, and thus governed by the CDA, Mr. Nussbaum could only toll the statute of limitations by showing that he "timely sought reconsideration of the contracting officer's final decision." Def.'s Reply at 4. Because he did not file a motion for reconsideration, the government asserts, Mr. Nussbaum's equitable estoppel arguments should also be rejected under the CDA. *Id.*

### A. Section 2501

A claim is barred in this court under Section 2501 "unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A claim accrues "as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, *i.e.,* when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc) (quoting *Nager Elec. Co. v. United States*, 368 F.2d 847, 851 (Ct. Cl. 1966)) (other citations omitted).

The Supreme Court recognizes a distinction between jurisdictional and non-jurisdictional statutes of limitations. See *John R. Sand & Gravel Co.*, 552 U.S. at 133-34. Non-jurisdictional statutes of limitations permit courts to toll the time period in light of special equitable considerations, but jurisdictional statutes of limitations are more absolute. Designed to foster broad, systemic objectives of judicial efficiency, jurisdictional statutes forbid courts from considering equitable doctrines that might otherwise prevent the limitations period from running. *Id.* Section 2501 is a jurisdictional statute and is thus "not susceptible to equitable tolling." *Id.* at 136.

If Mr. Nussbaum's claims are governed by Section 2501, then, as the government asserts, he could not bring his claim because the six-year period has run, and equitable tolling is not available to him. *See* Def.'s Mot. at 2-3. At the latest, Mr. Nussbaum's claims accrued around the time he received the denial from Mr. Wenkman in March 2010, meaning that he would have had to bring his claim in March 2016 for it to fall within the limitations period. Because no equitable tolling is available, the statute of limitations would categorically prevent this court from hearing Mr. Nussbaum's claims under Section 2501. But Section 2501 is not the pertinent statute of limitations here. Instead, this case is governed by the CDA.

### B. The Contract Disputes Act

The CDA governs disputes involving "any express or implied contract . . . made by an executive agency for . . . the procurement of construction." 41 U.S.C. § 7102(a). Mr. Nussbaum maintains that he had a contractual management through Cal Inc. with the Bureau of Prisons to provide construction services, and therefore his claim falls within the ambit of the CDA.

The CDA establishes a mandatory administrative process that requires a contractor to submit a "claim" to the contracting officer before the contractor may file suit on that claim in this court. 41 U.S.C. § 7103(a)(1). Compliance with the dispute resolution procedures set forth in the CDA is a prerequisite to the court's exercise of jurisdiction over claims covered by that Act. *See England v. The Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) (noting that "jurisdiction over an appeal of a contracting officer's decision is lacking unless" the administrative procedures are followed). The claim must be in writing and, if it exceeds $100,000, must certify that: (1) it is made in good faith; (2) the supporting data is accurate and complete; (3) the amount requested reflects the amount for which the contractor believes the government is liable; and (4) the certifier is authorized to certify the claim on behalf of the contractor. 41 U.S.C. § 7103(b)(1). After the claim is submitted, the contracting officer is required—within sixty days—to either issue a decision or notify the contractor of the time within which a decision will be issued. 41 U.S.C. § 7103(f)(2).

Shorter than the general six-year statute of limitations applicable to claims under Section 2501, the limitations period set forth in the CDA requires that suit be initiated in this court within one year of the contractor's receipt of the contracting officer's decision. 41 U.S.C. § 7104(b)(3). A contracting officer's failure to issue a decision within sixty days is "deemed to be a decision . . . denying the claim." 41 U.S.C. § 7103(f)(5). Thus, if a contractor receives no response from the contracting officer within sixty days of filing his complaint, the complaint is deemed denied and the contractor must file suit in this court within one year. *See Baistar Mech., Inc. v. United States*, 128 Fed. Cl. 504, 515 (2016) ("When a contracting officer fails to issue a final decision within the allotted time under the CDA, the contractor's claim is 'deemed' denied and the contractor is permitted to seek relief in this court.").

Here, the government does not appear to dispute that Mr. Nussbaum's claim submitted to the contracting officer satisfied the administrative procedural requirements of the CDA. As part of the settlement of state court litigation with Cal Inc., Cal Inc. agreed to sponsor Mr. Nussbaum's claim to the contracting officer. *See supra*, at 4; *see also* Hr'g Tr. 6:5 to 7:11. In pursuing dismissal on alternative grounds, the government focuses on the one-year statute of limitations for filing in this court. Even assuming Mr. Nussbaum's claim satisfies the procedural requirements, it is far outside the one-year statute of limitations. Mr. Nussbaum received the letter from Mr. Wenkman denying his claim in March 2010, and he never received any response from the contracting officer, Contigny Arakaki. Even if Mr. Wenkman's response does not constitute a denial given that he was not actually the contracting officer, the lack of response from Ms. Arakaki within sixty days is itself deemed a denial under the CDA. In any event, the one-year statute of limitations had run, by any measure, before Mr. Nussbaum filed his claim in this court approximately nine years later. Mr. Nussbaum's claim, therefore, falls outside the CDA's statute of limitations unless he can establish that it should be equitably tolled.

### C. Equitable Tolling

The CDA contains two separate filing deadlines. First, Section 7103 requires that a contractor submit his claim to the contracting officer within six years after accrual of the claim. 41 U.S.C. § 7103(a)(4)(A). The government does not appear to dispute that Mr. Nussbaum met this deadline. Second, Section 7104 establishes a one-year period for suing in this court based on a decision or deemed denial by the contracting officer. 41 U.S.C. § 7104(b)(3). The one-year deadline is the limitation at issue here. The Federal Circuit has explicitly held that the six-year limit in Section 7103 is not jurisdictional. *See Sikorsky Aircraft Corp. v. United States*, 773 F.3d

1315, 1322 (Fed. Cir. 2014) (holding that Section 7103 is not jurisdictional because it "does not have any special characteristic that would warrant making an exception to the general rule that filing deadlines are not jurisdictional"). But the Federal Circuit has declined to decide whether the one-year filing deadline in Section 7104 is jurisdictional, while simultaneously emphasizing that the Supreme Court "in recent years has repeatedly emphasized that 'filing deadlines ordinarily are not jurisdictional.'" *Guardian Angels*, 809 F.3d at 1252-53 (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 154 (2013)). Indeed, the Supreme Court has held that "quintessential claim-processing rules" should not be characterized as jurisdictional unless "there is any 'clear' indication that Congress wanted the rule to be 'jurisdictional.'" *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435-36 (2011) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006)). Especially given that there are no special characteristics in Section 7103 indicating that it should be jurisdictional, such factors do not appear to be present in the context of Section 7104 either. It is unnecessary, however, for the court to decide whether Section 7104 is jurisdictional because—even assuming it is not—Mr. Nussbaum cannot satisfy the standard for equitable tolling.

Equitable tolling is a "narrow doctrine." *Martinez*, 333 F.3d at 1318. It requires the litigant to establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe*, 136 S. Ct. at 755. Both prongs of this test must be met. *Id.* at 756 ("Equitable tolling's two components [are] 'elements,' not merely factors of indeterminate or commensurable weight.") (citation omitted). The second prong is met "only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." *Id.* at 756 (emphasis in original). Notably, the Supreme Court regards this high bar for equitable tolling, which is applied in the habeas context, as a minimum test and suggests that when applied in a civil proceeding the standard may be even higher. *Id.* at n.2 (noting that the equitable tolling test derives from a habeas case and does not necessarily apply outside of it, but declining "to decide whether an even stricter test might apply to a nonhabeas case"). Moreover, the Supreme Court has held that "mere excusable neglect is not enough to establish a basis for equitable tolling; there must be a compelling justification for delay, such as where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Martinez*, 333 F.3d at 1318 (quoting *Irwin v. Dep't. of Veterans Affairs*, 498 U.S. 89, 96 (1990)).

Mr. Nussbaum fails to meet either prong of the test. Regarding the first prong, he has produced no evidence showing that he made efforts to pursue his case during the nine-year period from when he received the denial from Mr. Wenkman until he filed suit in this court. The only documentation Mr. Nussbaum produced when the court inquired about his activities during this period was email correspondence with GAO, all of which occurred after he had commenced this litigation in March 2019. Given that Mr. Nussbaum was unable to produce any evidence about his actions regarding this matter during that time, the court has no basis for concluding that he pursued his claims diligently.

Mr. Nussbaum also fails to satisfy the second prong. He argues that the period should be tolled because Ms. Arakaki's "prosecutable" actions—by which he presumably refers to her having "abandoned her duties"—made it "impossible to comply with" the statute of limitations, rising to the kind of "compelling" justification for the delay. Pl.'s Opp'n at 10. Yet, even if Ms. Arakaki's inaction respecting his complaint constitutes misconduct, that is insufficient to satisfy the kind of compelling justification required because the statute itself contemplates that contracting officers will sometimes fail to respond to claims. To that end, it authorizes plaintiffs

9

to pursue their claims in this court after sixty days without a decision from the contracting officer, meaning that Mr. Nussbaum's failure to file suit within the one-year time period was neither extraordinary nor outside his control. It was not extraordinary because the very text of the statute anticipates that contracting officers will occasionally ignore claims, and it was not outside his control because the lack of response was deemed a denial that authorized him to bring his claim as soon as sixty days had passed. Given that the statute explicitly makes allowance for such a scenario, a contracting officer's mere failure to respond to a claim cannot establish the kind of misrepresentation, inducement, or trickery that would create a compelling justification for tolling.

While the court is not without sympathy for Mr. Nussbaum, it is bound by the jurisdictional limitations prescribed by Congress. Statutes of limitations are designed to ensure the prompt and just adjudication of disputes and to balance competing interests. *See John R. Sand & Gravel Co.*, 552 U.S. at 133. And although the application of a statute of limitations may seem unfair on an individual level, these laws "seek . . . to achieve [a] broader system [of] related goal[s], such as facilitating the administration of claims, limiting the scope of a governmental waiver of sovereign immunity, or promoting judicial efficiency." *Id.* (citations omitted).

## CONCLUSION

For the reasons stated, the court finds that Mr. Nussbaum's claim is untimely and cannot be equitably tolled. The government's motion to dismiss for lack of subject-matter jurisdiction is GRANTED in part and DENIED in part. Mr. Nussbaum's complaint is dismissed, but for failure to state a claim upon which relief can be granted and not for a lack of subject-matter jurisdiction.

The Clerk shall enter judgment accordingly.

No costs.

It is so **ORDERED**.

_____
Charles F. Lettow
Senior Judge